*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1730**

State of Minnesota,
Respondent,

vs.

Joshua Michael Krall,
Appellant.

**Filed August 4, 2014
Affirmed
Smith, Judge**

Washington County District Court
File No. 82-CR-13-181

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Peter Orput, Washington County Attorney, Robin M. Wolpert, Assistant County Attorney, Stillwater, Minnesota (for respondent)

Anders J. Erickson, St. Paul, Minnesota (for appellant)

Considered and decided by Smith, Presiding Judge; Bjorkman, Judge; and Klaphake, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**SMITH**, Judge

We affirm appellant's conviction of terroristic threats because the district court did not abuse its discretion by admitting evidence of a prior conviction and because the conviction before us is supported by sufficient evidence.

**FACTS**

On January 10, 2013, shortly after 4:00 p.m., R.C. sent two text messages to appellant Joshua Michael Krall's cell phone number, asking him to stop contacting her. Two minutes later, R.C. received the following text message from Krall's cell phone number: "I'll blow up your house c-nt b-tch I can't f--king wait." About 45 minutes later, after receiving approximately 15 to 20 similar messages from Krall's number, R.C. went to the Washington County sheriff's office with her five-year-old daughter.

R.C. met with Deputy Jason Sutherland. During the meeting, R.C. continued to receive text messages from Krall's cell phone number. Deputy Sutherland documented the text messages and called Krall's cell phone number on his own phone. A man answered the deputy's call. Deputy Sutherland identified himself and asked for Krall. The man stated that the deputy had the wrong number and he did not know who the deputy was looking for; the man then disconnected the call.

After approximately 30 minutes, R.C. left the police station. Moments later, she received additional text messages from Krall's cell phone number. She called 911 and met with Deputy Sutherland again. Deputy Sutherland documented the new messages and dialed Krall's cell phone number; he was unable to make contact with anyone.

2

Respondent State of Minnesota charged Krall with terroristic threats, in violation of Minn. Stat. § 609.713, subd. 1 (2012). The state notified Krall of its intent to introduce evidence of his 2011 conviction of terroristic threats to prove knowledge, identity, and a common scheme or plan. Before trial, the district court decided to admit the evidence, noting that the conviction was very recent and "nearly identical in many respects to the case before the court." However, the district court explicitly limited the scope of this evidence to "the occurrences," precluding testimony about any prior incarceration.

At trial, R.C. testified that she had known Krall since she was in high school, and her fiancé had been friends with Krall "since they were very young." She testified that in early December 2012, Krall needed a place to stay and asked her if he could stay with her and her daughter; she agreed, as she "was under the impression that it would just be a couple days." Krall, however, stayed for nearly a month, ultimately leaving at R.C.'s request. R.C. testified that during this time, Krall possessed a cell phone and was its sole user. Krall used his phone to communicate with R.C., and R.C. saved Krall's contact information in her cell phone. After Krall left, R.C. continued to receive text messages from Krall's cell phone number, including "flirtatious" messages. R.C. testified that near the beginning of January, she asked her fiancé to talk with Krall about ceasing the messages. She also testified that when Krall's messages became "continuous" and "more vulgar," interfering with her and her daughter's evening routine, she asked him to stop contacting her.

3

Detective Charles Aldean testified regarding the investigation of Krall's cell phone records. He testified that Krall's number is associated with a pre-paid cell phone, and therefore lacks subscriber information and detailed records. However, the records indicated that several text messages were sent from Krall's cell phone to R.C.'s cell phone on January 9 and January 10, 2013.

Finally, G.I. testified regarding a prior incident. G.I. testified that he is a minister and that he mentored Krall for a few years. During this mentorship, G.I. helped Krall find programming for his needs. In March 2011, after Krall left a program, Krall reached out to G.I. and G.I. said he could no longer help him, as Krall already knew "where to go, what to do." Shortly thereafter, Krall left a "very angry, intimidating" voicemail message on G.I.'s cell phone. In the message, Krall referred to G.I. as a "mother f--ker" and a "staged b-tch," and threatened to kill him.

The district court gave two cautionary instructions to the jury about the use of G.I.'s testimony, one immediately before the evidence was presented and one as part of the final jury instructions. The state also explained the particular use of this evidence in both its opening statement and its closing argument.

During its deliberations, the jury sent the district court a note containing three questions regarding the 2011 conviction: "What are the results of the previous charge against Joshua Krall in 2011? What was his punishment from the March 2011 dispute? What is the sentence of terroristic threats after a plea?" Immediately thereafter—before the district court could address the question—the jury asked the district court to disregard

the questions, and informed the district court that it had reached a verdict. The jury found Krall guilty as charged, and the district court sentenced him to 27 months' imprisonment.

# D E C I S I O N

## I.

Krall first argues that the district court erred by admitting evidence of the prior incident resulting in his 2011 conviction of terroristic threats. We review this decision for an abuse of discretion. *State v. Ness*, 707 N.W.2d 676, 685 (Minn. 2006). "A defendant appealing the admission of evidence has the burden to show it was erroneous and prejudicial." *State v. Bartylla*, 755 N.W.2d 8, 20 (Minn. 2008). Evidence of a defendant's other crimes "is not admissible to prove the character of [the defendant] in order to show action in conformity therewith." Minn. R. Evid. 404(b). But such evidence, often referred to as *Spreigl* evidence,[1] may be admissible for other purposes, such as to show a common plan or scheme, knowledge, or identity. *Bartylla*, 755 N.W.2d at 20; Minn. R. Evid. 404(b).

Before a district court may admit *Spreigl* evidence, five elements must be met: (1) the state must give notice of its intent to admit the evidence; (2) the state must clearly indicate what the evidence will be offered to prove; (3) the defendant's involvement in the act must be proven by clear and convincing evidence; (4) the evidence must be relevant and material to the state's case; and (5) the probative value of the evidence must

---

[1] *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965).

not be outweighed by its potential for unfair prejudice to the defendant. *Ness*, 707 N.W.2d at 685-86; Minn. R. Evid. 404(b).

Krall argues that in light of the jury's question during deliberations, the fifth element—regarding the evidence's probative value versus its potential for unfair prejudice—was not met. However, caselaw establishes that the jury's question does not factor into the evidence's admissibility; such questions are relevant only to deciding whether any error in admitting the evidence was harmless. *See State v. Vanhouse*, 634 N.W.2d 715, 721 (Minn. App. 2001) (analyzing the jury's questions about the *Spreigl* evidence only after concluding that the district court did not abuse its discretion by admitting the evidence), *review denied* (Minn. Dec. 11, 2001).

In terms of probative value, the central issue in this case was who sent R.C. the threatening text messages. It is undisputed that the evidence identifying Krall as the sender was circumstantial. Defense counsel tried to establish that another, unidentified third party could have used Krall's cell phone to send the messages. Because of the marked similarity between the facts underlying Krall's 2011 conviction and the facts underlying the threats to R.C., the 2011 conviction is probative of identity and a common scheme or plan. *See Bartylla*, 755 N.W.2d at 22 (concluding that evidence from a prior burglary conviction was probative of a defendant's identity and common scheme or plan on a murder charge "because of the marked similarity between the facts underlying the burglary and the facts underlying [the] murder"). And any potential for unfair prejudice was mitigated by the district court's two cautionary instructions, as well as the state's particularized explanations of the evidence. *See id.* On this record, the district court did

not abuse its discretion by finding that the probative value of the evidence was not outweighed by its potential for unfair prejudice. Because the challenged element for the admission of *Spreigl* evidence is satisfied, the district court did not abuse its discretion by admitting the evidence at issue.[2]

**II.**

Krall next argues that the evidence is insufficient to support his conviction of terroristic threats. When, as here, the jury's determination of guilt rests exclusively on circumstantial evidence, we employ a two-part standard of review to analyze the sufficiency of the evidence. *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010). First, we identify the circumstances proved, deferring "to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflict[s] with the circumstances proved by the State." *Id.* (quotation omitted). "[I]n determining the circumstances proved, we consider only those circumstances that are consistent with the verdict." *State v. Silvernail*, 831 N.W.2d 594, 599 (Minn. 2013). Next, we examine all reasonable inferences that may be drawn from the circumstances proved, without *any* deference to the jury's choice between reasonable inferences. *Andersen*, 784 N.W.2d at 329-30. To sustain a conviction based on circumstantial evidence, all such reasonable inferences must be "consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* at 330. "We review the circumstantial evidence not as isolated

---

[2] Going forward, however, we note that we recently iterated the supreme court's caution to the district courts that "'[t]he final determination of the strength of the state's case should be made . . . *after* the state has presented all of its non-*Spreigl* evidence.'" *State v. Welle*, 847 N.W.2d 52, 60 (Minn. App. 2014) (quoting *State v. Kennedy*, 585 N.W.2d 385, 392 (Minn. 1998)).

7

facts, but as a whole." *Silvernail*, 831 N.W.2d at 599. "[I]nconsistencies in the state's case or possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable." *State v. Tscheu*, 758 N.W.2d 849, 858 (Minn. 2008) (quotation omitted). Accordingly, mere conjecture will not overturn a conviction that rests on circumstantial evidence. *Andersen*, 784 N.W.2d at 330.

Viewed in the light most favorable to the verdict, the evidence proves the following circumstances: In December 2012, R.C. permitted Krall to stay at her home for nearly one month. Krall ultimately left at R.C.'s request. While Krall stayed with R.C., he possessed a cell phone and was its sole user. Krall communicated with R.C. using this cell phone, and R.C. saved Krall's contact information in her own phone. In the two to three weeks after Krall's departure, R.C. continued to receive text messages from Krall's cell phone number. These messages ranged from basic greetings to "flirtatious" or "vulgar" language. The frequency of these messages increased, becoming "continuous" and disruptive until, on January 10, 2013, R.C. responded with two text messages, requesting that communication cease. Two minutes later, R.C. began receiving a long string of threatening text messages—including explicit language and threats on her life— from Krall's cell phone number. Midway through this string of messages, R.C. went to the police. A deputy called Krall's cell phone number and identified himself. An unidentified male answered the call, stated that the deputy had the wrong number and he did not know who the deputy was looking for, and disconnected the call. The deputy was unable to resume contact with anyone at Krall's number.

8

The evidence also proves that, in 2011, Krall made terroristic threats against a former mentor.  This mentor helped Krall locate assistive programming for several years, but ultimately told Krall he could no longer be of service.  Shortly thereafter, Krall left a threatening voicemail—including explicit language and a threat on his life—on the mentor's phone.

Having identified the circumstances proved, we now examine all reasonable inferences that may be drawn from these circumstances, giving no deference to the jury's choice between reasonable inferences.  Because the circumstances proved establish that in January, Krall continued to communicate with R.C. using the phone he singularly possessed in December, and considering the tight timeline between R.C.'s attempt to end this communication and the threatening messages, the only reasonable inference is that Krall sent the threatening text messages.  The possibility of an unidentified third party sending the messages is based on mere conjecture, and does not entitle Krall to relief.

**Affirmed.**